Your honors, good morning. I would like to reserve some time. I had your wrong name. Good morning, your honors. I would like to reserve some time for rebuttal and I'll attend to my own clock. May it please the court. In denying summary judgment to the association, the district court correctly explained why this court should reinstate the jury's unanimous verdict for the Morris's. If I were to grant summary judgment, the court explained, the Ninth Circuit would reverse me almost immediately. I think the letter may have been an attempt to offer some type of conciliation or recognition of sensitivity to others' religious beliefs. The problem, though, is the summary judgment standard, which requires that the court construe the evidence and any reasonable inference that can be drawn from the evidence in a light most favorable to the plaintiff. So the question is whether a jury could view that as evidencing a discriminatory intent. And I just have to say, I think they could. That's exactly how the jury did view the evidence, which is why this court exactly. I'm sorry, your honor. What exactly is the discrimination? Is it just I understand it's that at some points, it said that they wanted to a house to be sold to somebody of a different religion. And at other points, it seems to be focusing on the this pageant or event as a religious participation activity that he was essentially entitled as a as a matter of protection of his religion to carry out. So is it one or the other or both? I think they're both somewhat problematic for different reasons. What is the exact claim here or does it matter? I mean, this letter is no doubt, you know, has some mention of religion and we need to deal with it. But what does it tell you about what was the discrimination here exactly? Your honor, and let me begin where your question left off with was with the letter. And I think there's an important distinction between that claim, which is brought under Section 3604 C of the Fair Housing Act, and the other two claims brought under 3604 B and 3717, respectively. And the significant difference is this for a claim brought under 3604 C. The statutory language refers to any statement that indicates a preference based on a protected or prohibited characteristic. So under the language of the statute, the statute itself actually uses a statement indicating a preference. And that's actually the statutory language that was used in the jury charge here. So the question is, could an ordinary reader have viewed the letter as a statement indicating a preference for religion or preference for the non-religious neighbors, what the letter itself refers to as non-believers? Well, I have a hard time seeing how that could be the case. In other words, it is the statement. I find this a very hard case, but that particular suggestion seems quite not what a reasonable person would think. I mean, they think they don't want him to have this pageant because it would upset people who are not of the same religion or who are of the same religion. Again, Your Honor, I think the statutory language with the 3604 C claim, I think what you're focusing on, Your Honor, is the distinctiveness of a 3604 C claim as opposed to the other claims because the intent... I don't understand. Are you saying I'm right about the third about that claim but not the other claims? No, Your Honor. I'm just saying I think the difficulty... I mean, I would certainly disagree that the jury's verdict wasn't sound with respect to the other claims, but I think particularly with respect to the 3604 C claim, looking at the letter, the intent or the motivation of the homeowners association of the Why would anybody read this statement as saying that they don't want him because he's Christian as opposed to they don't want him because he's having a huge and disruptive, maybe religiously based event which will annoy people who aren't religious. I understand the second is viable. The first doesn't even seem like any sensible person would think that's what it was saying. Two responses to that, Your Honor. I think first the district court in its summary judgment, in its directed verdict, and its motion to dismiss rulings certainly thought that... It doesn't matter. It doesn't matter. It's a legal question. Yes, as a legal question, Your Honor, I think the legal question is could a reasonable reader in case law that says it doesn't have to jump off the page, it's just could a reasonable reader, and I think a reasonable reader reading, and finally, I am somewhat hesitant in bringing up the fact that some of our residents are non-Christians or another faith, and I don't even want to think of the problems that could bring up. But the whole discussion is about the event, not about the person or the fact that he's Christian. I would point... I respectfully disagree, Your Honor. I think that statement is very much about, and I think it's, again, it's religion is the protected characteristic. So the question that the statute presents is, is a difference being made? Is a preference being expressed based on religion? For religion, against religion, for not... And here, I think, if you look at the case law in terms of courts that have held an ordinary reader standard satisfied in the context of race, or sex, or family status, the language is, frankly, much less facially explicit than we have here with respect to pointing at the fact that some of our residents are non-Christians or of another faith, and I don't want to even think of the problems that could bring up, and going on to say, and fill our neighborhood with the hundreds of people and possible undesirable. So we did not move, the Morrises did not move for summary judgment or not disputing that a reasonable person could read the letter exactly as the district court said its preference was. But that isn't the legal standard. The jury, seven unanimous members of the jury, read the letter and understood it as expressed. And certainly, I just don't think it can be said, Your Honor, which is what this court would have to rule, that the letter could only, only be read the other way, especially with the explicit reference to non-Christians or members of another faith. But again, we certainly don't rely only on the letter, even if, Your Honor, set aside the letter altogether. We have two other claims, the 3604B claim and 3717 retaliation claim, and ample evidence, the jury had before it, ample evidence to rule for the plaintiff. And again, the legal standard is, was there, not just was there sufficient evidence, but could the evidence only be read to support the opposite conclusion? And I think on this record- Even if we agree with you on one or more of the claims on the Rule 50 motion, the standards are very different for a new trial motion. The judge gets to weigh the evidence and gets to decide whether or not the jury's verdict was clearly against the weight of the evidence, and we review under a very deferential standard. How can we reverse that on this record? Yes, Your Honor. I think reversal is required for several reasons. In following up with the discussion on the 3604C claim, the district court rested its new trial decision largely on credibility determinations. It paid two witnesses out of 18. Even if his court were to say that the district court didn't commit error and was within its rights to make those credibility determinations, those credibility determinations have absolutely no relevance to the 3604C claim, which only looks to the language of the letter and whether the letter, I guess in this framing, whether a reasonable, whether an ordinary reader would view the letter as expressing a preference for or against religion. So regardless of that argument, the 3604C claim would survive. I think the others, too, in terms of the district court's ruling for a new trial on the basis of the jury's disregard of instructions, I think the fact that my friend on the other side had to rely on a no other evidence linking the criminal defendant to the crime as an occasion when it is permissible to bust the presumption that juries are able to entrust it to follow instructions. I think that was legal error and certainly the district court didn't really explain that decision. And finally, to the extent that the district court's new trial determination rests on the view that the jury's verdict was against the clear weight of the evidence, which is itself a difficult standard to meet. And again, based on the ample evidence that we've laid out in our brief, we think that's simply a standard that cannot be met in this case. What about the injunction? I mean, certainly when you put the evidence of what happened at the events against the plain language of the regulations of the Homeowners Association, they don't seem to be a terribly good fit. Yes, Your Honor, a couple of responses to that. As we discuss in our brief, Idaho law is clear on the point that any ambiguity in restrictive covenants should be construed in favor of the free use of the land. So we think, at a minimum, that legal principle resolves the counterclaims that the Homeowners Association brought. Because as a matter of Idaho law, we agree that there's, at a minimum, as Your Honor said, a poor fit re-ambiguity, which Idaho law is clear has to be construed in favor of free use of the land. So again, it's the Homeowners Association and in favor of the mosses. You never really answered my question, my initial question, about whether with regard to at least 3604B, during and after, is your claim rest on the notion that this were not allowing it, was banning the practice of religion, that it was a religious practice? Your Honor, I think that was certainly part of it. I don't think that the answer to that question is dispositive with respect to the statute, which refers to religion. So whether one conceives of religion in terms of the Morris's personal beliefs, as they lived out those beliefs, in hosting the Christmas event, or whether... The Christmas event, you know, with Frosty the Snowman and hot chocolate and bugles and so on, didn't seem like a religious practice as such. I keep thinking about examples like, you know, if Jewish people put a mezuzah in front of their house, I can see that that would be a discrimination against religion, because that's a specific religious practice. And we're very forgiving as to what is a religious practice, if it's claimed to be a religious practice, but I don't even see the claim here, in fact. That it's religion, and it was... He was celebrating a Jewish, a religious holiday, but he was celebrating it in a way that I don't think would be credible, a claim that it was a religious practice as such, and I don't think he claimed that. Your Honor, I think the record is very clear, and there's never been any dispute on this, that for the Morris's, the Christmas show was very much an expression of their Christian faith. It was an opportunity for them to witness to their neighbors, with a nativity scene, with Christian poems attached to candy canes. At no point in this litigation has anyone ever questioned that to the Morris's, this Christmas show was an expression of their Christian faith, an attempt to minister and witness to their community. And I see that I'm over my time. Your time is up. Thank you. Thank you, Your Honors. Thank you, Your Honor. My name is Peter Smith. I'm the attorney for the Homeowners Association, and I'd like to start with the letter itself, where Judge Berzon questioned how this letter could be read to be discriminatory against a Christian, and the language of the letter. Well, I didn't exactly say that. It really dealt particularly with the language of the 3604C and the verdict, which says, a preference that a non-religious individual purchase Mr. and Mrs. Morris's home. That seems to be somewhat far-fetched, although I find the letter troubling. So that's why I'm kind of torn about it. But I'm not, you put it that way, whether they cared about whether the person who bought the house was religious or not religious, that doesn't seem to be borne out by the letter. Personally religious or not religious. Certainly, Your Honor. And the letter, the plain language of the letter does talk about religious plurality. It talks about Christians and non-Christians. It talks about the Morris's being welcomed in the neighborhood, and there's no intent for them not to buy the house. And so the letter itself, as the district court found, doesn't have any preference for the Morris's religion, or in the opposite, any preference that they not be Christian. And what was borne out of the trial? But it does exhibit some concern for putting religion, if other people are being offended by it. And to go back to my hypothetical, if a Jewish person puts a mezuzah on their doorpost, which is a religiously required thing, and it's not disruptive to anybody, but if somebody else is offended, would that be a reason for not allowing it? No. Well, they wrote a letter and said, you know, I don't, there are non-religious people here, and they're not going to like you having this mezuzah on your doorpost. Is that a reason? No. No. So what's the difference? The difference is... In terms of that sentence in the letter, I understand the context is otherwise. As to that sentence in the letter, it just simply states a fact, that there are non-Christians in the neighborhood, and there's no preference expressed that you be Christian if you move in, or you be non-Christian that you move in. The letter was admittedly poorly drafted. I think everybody submitted that. It was rushed out because Mr. Morris had represented that he needed an answer very quickly. It was done by laypeople who are volunteers of a homeowners association. Now, what were they really concerned with here? They were concerned with this Christmas program, which really has very little to do with Christianity, other than it's surrounding a Christmas holiday. You know, I understand for your opposing counsel's argument on the new trial seem to suggest that the B claim was perhaps tougher for the new trial for them. But I think conversely, the Rule 50 is tougher for you on the B, where the standard is subjective intent. And this seems to me to be a classic jury question on the issue of intent. And the trial court, it seemed to me, got it right at summary judgment, and then wrong at Rule 50, and just weighed the evidence in a way that that was not the drawing the inferences in favor of the jury's verdict. Why is that? Why am I wrong in concluding that? I certainly agree with your statement that that is the tougher issue. But I'd like to highlight what the evidence was at trial. And by evidence, I mean admissible evidence. And we had a lot of testimony that the plaintiffs put on that was objected to early on about things done by homeowners. There was the Larry Bird recording, which was objected to. There was the neighbors who had people coming to their neighborhood parking in their driveways in front of their homes that they came out and said things to them that probably were not appropriate. That happened. There was no nexus, no connection whatsoever between those acts and the homeowners association. All right, Mr. Smith. Now, what you're getting into is, I guess, one of the questions that bothered me is, what evidence exactly legally can be attributed to the homeowners association? In other words, you're implying that, well, individual homeowners don't speak for the association, right? And so the jury can't base their verdict on what those homeowners say or do. What is the law on this, you know, on these homeowners association? The law is, frankly, unclear unless we look to Idaho corporate law. The association is an Idaho nonprofit corporation. It exists all of its own. It acts through its directors, officers, and agents. And the court made a very specific finding as to who those individuals were as we went through the trial. The homeowners do not act for the homeowners association. They act on their own. So Mr. Bird, he was not on the board. He was not an officer. He was not an agent. So the judge rightfully advised the jury that that testimony was stricken after it was heard. The evidence of the homeowners coming out and talking- If it's not binding on the homeowners association or given that instruction, what were the purposes of admitting that evidence in the first place? The judge was asking the plaintiffs to connect it to the homeowners association. Now, I want to point out the plaintiffs tried their case the way they wanted to try it. They presented all the evidence of the harassment over our objection. We had sidebars about it. I repeatedly said, you need to connect this to the HOA, and they kept saying they would. They got to the end of their case, they arrested, and they were unable to do that. There was absolutely no connection between these homeowners and the homeowners association itself, which is an entity. And so the evidence was stricken. If they would have come out and presented evidence first of trying to draw the connection, then we wouldn't have had this problem where the jury heard all of this testimony about purported death threats, which was an overblown characterization of what was said, about what third parties did, in other words, homeowners to visitors to the program. They were people that were invited through Facebook. There were 7,000 invites on Facebook to this event. Over 1,000 people attended a night. There were buses coming and going to the event. They were unable to connect any of those people to the homeowners association other than they happened to be a member. It's almost like if you are a shareholder in a major corporation like Microsoft and you commit a violation of law, is Microsoft responsible? Absolutely not. Let's go back to the letter and the inferences that can be drawn from the letter. I mean, because the trial court draws the inference that they were just trying to be neutral and not show any favoritism towards one group or the other. But I mean, that may be a permissible reading. I'm not sure. But there's certainly an alternative reading from the sentence. I'm somewhat hesitant in bringing up the fact that some of our residents are non-Christians or of another faith, and I don't even want to think of the problems that that could bring up. That could be read to mean that they were concerned that people wouldn't like their display of their Christian faith and that, therefore, it wasn't going to be allowed. Is that a permissible objective for a homeowners association to have if it's read that way? Is that discriminatory to do that? The letter itself, now we've got to put it into context. I think that's key of what the program that we're talking about was a five-day event with thousands of people attending. Now, there were other homeowners who would find that. One of that is in this statement in the letter. The letter, the statement that I just read in this letter says that we don't, we're worried about the reaction that non-Christians will have to the display or to what's contemplated. That's what it says. Why couldn't a reasonable juror read that as expressing, as going along with distaste or opposition to the expression of the Christian faith in that? Why isn't that a reasonable reading? It may not be the right reading, but why couldn't someone reasonably read that to say that? Your Honor, simply because that's not what the letter says. It talks about the residents are non-Christians, which is either a fact or not, we don't know, or of another faith, which may be true or may not be true. And I don't even want to think of the problems that could bring up. So they're talking about the other folks of other faiths. And they're expressing, why isn't that a suggestion that you, actually with this event at least, if you had the same event, but it wasn't a Christian event, it might be okay. Your Honor, I believe the question was, if the non-Christian reads this and thinks there's a preference for a Christian, or a Christian reads this and think there's a preference for a non-Christian. What I'm saying is this, there's a whole playing out of why this is a big nuisance, and there are older people, and there's a problem with medical emergencies. What is the point of bringing up this, the fact that some of our residents are non-Christians, and I don't want to think of the problems, which seems they're just essentially, they're not going to like it, and we're going to defend their right to not like it, suggesting that this event is different from, if it were, a 4th of July party. And we're going to not let you have it, but we will let you have it if it was a 4th of July party. So I think there's two points there. First, if it was a July 4 event, or any other event, I think the neighbors definitely would have had the same objection. I understand that, but what's that sentence doing in there? I mean, if they would definitely have had the same result, then that sentence is superfluous. So I was getting to that, Your Honor. With the other type of event that would violate the terms of the covenants and conditions and restrictions, whether it was Christian or not, that would violate those covenants. So this one being tied to, or purportedly tied to, a Christian event, isn't that an endorsement of that religion over other people's religion in the neighborhood? Well, that's certainly not what the sentence says. It doesn't say we can't allow it because we wouldn't allow it if it were anything else, and we can't favor a religious event. That's not what the sentence says. Correct, but it does point out that if the homeowners association sits by and lets this take place, that they are endorsing one religion over other people's religion. Because if this were a different type of religious event, it really has to focus on what the event itself was doing, and that's what this letter is pointing out. Is it artfully crafted? Absolutely not. Was the testimony at trial that they had any intent of discriminating or even thought about discriminating against Mr. Collins? But Mr. Smith, you had to keep in mind the distinction Judge Collins made in his questioning between the JMOL and the new trial motions. There are different standards that apply in evaluating the evidence, and I think the point that your opponent made earlier is that, although I think your explanation of what the homeowners intended or meant by that letter, the draft letter, is perfectly reasonable, the question is, is that the only reasonable alternate reading that could be made of the letter? Is there no other reasonable explanation for that statement? There is no other reasonable explanation other than they were concerned about the reaction of other neighbors to this event being characterized as a Christian event and being endorsed by the homeowners association. Another thing I've had a problem with here is how the Fair Housing Act operates. It seems to me, with regard to whether he could hold this event, this letter may well at least be subject to their reading, that there is a religious, at least in some respect, and I gather the FHA standard is a motivating reading, was that it was a religious event and that would offend people. Now, how does that come within the Fair Housing Act? Let's assume that you could read it that way. On the other hand, the letter also says that we're not trying to get you not to buy the house, and that seems perfectly credible. Their problem wasn't with him, it was with this event. And so does that come within, suppose they had said, look, please buy this house, we'd love to have you, but we're just telling you in advance you're not going to be able to have this event. Does that come within the Fair Housing Act? It does not. I mean, that seems to me the crux of things that really hasn't been debated or briefed very well. In other words, where does the Fair Housing Act cut off, essentially? It was during the purchase of their house, but it didn't seem to have to do with the purchase of their house, except if he was insisting I won't buy the house unless you let me have the event. But is that why? Because he was insisting that he wouldn't buy the house unless you let me have the event? He was not insisting that he would not buy the house unless he could have the event. He came and told them that he was going to have the event, and that he was going to buy the house, and they couldn't stop him. And if they did, he would sue them. Now, whether this event interferes with his housing, it absolutely does not. He can live peacefully in his house. If he didn't have the event, he never would have had this problem. The event is completely unrelated to his quiet enjoyment of his property. What he's doing is he's inviting thousands of people into the neighborhood to stand on his front lawn, sing Christmas carols, interact with Santa Claus for a fee, have dancing characters, including Clifford the Red Dog, the Grinch, and others, and then donate money to a charity. It has nothing to do with housing whatsoever. It has to do with his use of his front yard. And if the covenants, conditions, and restrictions are, as counsel stated, a contract underwritable law to be reasonably interpreted — I have a couple of questions about the covenants. Did you — did the regulations for the Homeowner Association require that a notice of violation be provided? Yes, Your Honor. In Section 7.2, there is a notice that must be given — Did you ever serve a notice of violation in this case? There was, Your Honor. Scott Corman served. He was an attorney representing the association and served a letter when the Christmas lights started to go up in September of 2015. Okay. And with respect to the other-than-single-family residential use, does that prohibit running a home office? It does not, Your Honor, because from the outside, it appears to be a single-family residence. The Idaho Supreme Court has interpreted that provision in a lot of covenants and come to that conclusion. However, when you start getting outward showings, which, if you look at this event and look at any of the pictures or the videos, it was clearly visible to the entire neighborhood and, in fact, promoted to be that way. It doesn't fall within a single-family residence definition. With respect to the decorate the exterior of the building visible from a neighboring lot, does that apply to Christmas lights? The board has waived that requirement. You could see them. So, in technicality, it could. Here we've got not just Christmas lights. Now, the extent of the Christmas lights is key when you're looking at interpreting the declaration. I think that you're going toward a waiver argument in some respect. What if you hang a flag? What about the mezuzah that Judge Burr has unused? That's visible from the neighbor's lot. Do you need the HOA's permission to hang that? Under the original writing of this declaration, the way it's written in, I think it's unambiguous. The answer would be yes. Has that been enforced? Yes. You would need, for even a modest thing like that, you have to go to the Homeowners Association to do that? I'm only speaking what the plain language says, and that appeared to be the intent of the draft. Well, that's part of the problem. These are just written so expansively that they allow the HOA to exercise, you know, the kind of discretion that we would often question in the new process context. It's sort of standard discretion that seems to ban everything, and then you need my permission to get anything back. Well, the Idaho Supreme Court has addressed this issue in many, many cases. What issue? I'm sorry, what issue is it? The issue of interpretation of the covenants, conditions, and restrictions, and whether they're binding on the land. And co-counsel is absolutely correct. There is a presumption of free use of land. But just as if an interpretation of a contract, if the contract is clear and unambiguous, then the court will enforce it. The specific provision that you're talking about, Judge, about outward displays, that has never been enforced. So the small displays with flags and other signs, I mean, there's a number of exhibits. There's a Patriot's flag, and there's a, you know, Happy Halloween sign. That has never been enforced, will likely never be enforced, and likely isn't enforced under Idaho code. What Mr. Morris did is took that to the extreme. If you compare those photographs to what he did, there's absolutely no comparison. 200,000 lights running all over the yard and in the trees and all over the house, including the roof. It's like something out of a movie. And the signs and the music and everything else. So we've got a totally different type of situation. And the Idaho Supreme Court has made clear in its waiver case law, including a case from 2014, that there needs to be an express waiver of a right. And we need to look at the conduct in each case and decide if the Idaho Supreme Court or decide at the Homeowners Association. Well, let me ask you something. Does it matter whether each of the – your time is well up, so I hope this is the last question. But does it matter whether the district court's reliance on each of the subsections is correct as long as its reliance on one of the subsections is right? It seems to me undeniable that this is a nuisance. Within the description of what a nuisance is. I am not at all sure that he was keeping a camel by having it around for a couple days. And that seems weird. And I'm not at all sure that this was a commercial endeavor. And I don't know about the lighting. But the nuisance seems to stand up pretty well. So does that justify the injunction? It does, Your Honor. Any one of those grounds would be a violation of the covenant's conditions and restrictions, allowing an injunction. Now, I would remind the court that, you know, granting the injunction, the judge sat through the trial. He saw the evidence. He looked at the pictures. It is an abuse of discretion standard. And we spent a lot of time looking at videos and everything else of this. And the judge came to the conclusion that it violated multiple provisions of the CCNR. Now, we can certainly disagree as to an opinion. But the judge that decided this issue was in the courtroom. Some of it is a legal determination. Correct, Your Honor. It's a mixed question. He seems to say some continuity. That's what keep means, not just have it on there, but keep it on there. Well, Your Honor, there's no definition of time in the declaration. It just says kept. So that would be, you know, certainly that's a legal question and one that perhaps raises an ambiguity that was resolved on the part of the judge, and rightfully so. I think my time is up, and I'm happy to stand. Thank you very much. Your time is very up. So, Ms. Hull, we will give you four minutes. Go ahead. Thank you, Your Honor. Let me first address your point, Judge Berzon. I think you were asking at one point about, you know, what is the link to the Fair Housing Act. And I think your earlier example from the Seventh Circuit case about the Mazzuzo on the door is actually a- It wasn't from the Seventh Circuit case. I didn't know there was a case. There actually is, Your Honor. It's a case from the Seventh Circuit that the Seventh Circuit held in bank and held that there was, in fact, an FHA violation. And what this court said in the CCCI versus Modesto case, it agreed with the Seventh Circuit that courts could consider what's called post-acquisition evidence on the basis of language in the Fair Housing Act that talks about the privileges, the privileges associated of homeownership. So, this court long ago decided that you could look at evidence that occurred after the acquisition of the home. And I would suggest that in exactly the same way that the homeowner or the apartment dweller in the Seventh Circuit case hung Mazzuzo on the door as an expression of religious faith, in exactly the same way the Morris' Christmas show here is an expression of their Christian faith. It's an expression of their religion. For two reasons. A, the Mazzuzo actually is religiously dictated. This is clearly not. And B, an awful lot of what's going on here is not religious, like the Grinch and Clifford the Red Dog and Hot Chocolate and so on. I mean, it's, there's absolutely no, it may be, it's just very far from anything that anybody else would think was an expression of religious practice. Certainly, Your Honor. It may be an expression that, you know, we love Christmas, but it's not an expression of any religious practice. Well, certainly, Your Honor, the Homeowners Association thought it was enough of a religious practice that they specifically objected to it in their letter pointing to people in the neighborhood of a different faith and the problems that it would bring up with respect to that. I did want to turn briefly to Judge Tasheem, I believe, your question about evidence. Can I just ask you a quick question? You had said on page 45 of your brief, you suggested that the Morris' never received a notice of violation. Your opposing counsel says that they did. Can you clarify that for me? Certainly. As I understand the record, Your Honor, the letter that the Morris' received from an attorney for the HOA threatened litigation. It was not a notice of violation in the sense of a violation that you get and you would get an attempt to cure. It was a letter informing the Morris' that they were in violation and threatening legal action on the part of the HOA. And I think... Show me. I mean, mostly, it can't be threatening litigation because nothing's happened yet. Oh, Your Honor, I think the judge is asking me about a different letter. The October 26, 2015 letter. The judge is asking me about the letter from attorney Scott Poorman. That's what I'm looking at, the October 26, 2015 letter. Yes. It says your planned event, we'll do this and we'll do that. And you have to request and receive written approval from the association board to conduct your planned event. And if not, if not, he's authorized to file an action seeking an injunction. So, basically, they're saying, you know, this is our determination and you can ask for a waiver. But if you continue on, well, then you'll... I understand you'll be saying you'll be in violation and we'll seek an injunction. Why isn't this a determination that there will be a violation if you go ahead with this unless you ask for a waiver? I don't think there's any dispute, Your Honor, that the letter highlighted that there were violations and that the... Would be, would be, could have happened yet. Yes, that's correct. And then the homeowners association took no action after the Christmas program was held, despite the letter, twice. So, I think that's where the issue of waiver, waiver would come in, in terms of the homeowners association then did nothing after sending the letter. But I did... They didn't file the law, so they said they were going to file. But they'd already made a determination that it was a violation and they need written approval. Yes, Your Honor. But again, the pageant, the program was held one year, 2015, 2016, again, with the HOA not taking, not taking any action. I understand. Which is why we think we have a waiver. That seems to me to be good for your client. They didn't go ahead and file soon. I, I... And he was able to put on his pageant. So, why does this support any kind of notion that there was a waiver? Well, I think, to the extent there was a, by waiver, I think, I think we're talking about the attempt to, to use the fact that the, the homeowners association sent the letter threatening legal action, did not take legal action. Eventually they did. When he sued them, they cross appealed, they cross moved and asked for an injunction then. And essentially this suit is that suit. This lawsuit is one that they threatened at that point. Well, after, yes, two years later, after two Christmas events were held and, and our clients sued. But I do want to get back to, I believe it was Judge Tashima's question about the evidence in this case that is directly linked to the board, to its members, to its agents. And that evidence including, even setting aside the neighborhood residents. If you set aside that evidence, even if you set aside the letter, there's an earlier, even more explicitly discriminatory draft of the letter sent to the Morris's. That's at ER 107 through, 105 through 07. There were calls by... Wait a minute. The earlier letter was never sent, was it? No, it wasn't. It is evidence that goes to discriminatory... Evidence that the person who wrote it may have had a problem, but not that the HOA did. I mean, the second one apparently wasn't supposed to be sent to either. Your Honor, there's no dispute that both the author of the original draft, the board, asked a former board member to draft the letter, edited the letter, and a board member sent the letter. So I don't think there's any dispute that this action... I mean, my friend and I on the other side disagree about the legal impact of it, but I don't think there's any dispute that these are actions properly attributable to the board, including calls... Not the draft. The draft also? Yes, the draft also. Why? Because it was drafted by a former board member at the invitation of the president of the board... Right, but that's why you have a draft. Then people look at it and say, oh no, this is what we need. Absolutely. And the jury was free to look at that evidence and determine what it meant. But in terms of the question, which is, was it attributable to the board? I don't think there's ever been any dispute that it is. Well, the letter that was sent is attributable because they agreed to it. Absolutely. And that's slightly unclear, but certainly the letter that wasn't sent, which was drafted by one person and then given to the board and not sent, I don't see how that's attributable to the board. It was drafted by the board's agent. There's never been any dispute about that. I look or draft something and I tear it up and I say, this is absolutely not what I want to say. I want to say something different. Is that attributable to me if somebody finds it? Yes, I think it is. Yes, Your Honor, I think it is. And again, the jury was free to decide they didn't mean this. They were free to discount what it said, but there was no dispute about who actually wrote it or to who it's attributed. Even if you set aside the earlier draft, you still have calls by the president and board members to the sellers of the Morris's home to discuss the Morris's, their Christmas program, their religion, and how the association didn't want them pressing their beliefs on others in the neighborhood. That's at ER 156. Board members statements to the Morris's realtor that they didn't want the Christmas program in their neighborhood. That's ER 51. And testimony that the association went house to house, spreading false and inflammatory information about the Morris's and their Christmas program. And that's at ER 162 and ER 189-391, as well as the episodes of selective enforcement with respect to the 4th of July, which is not a hypothetical. There actually were 4th of July parties. There were. I mean, I understand that for some reason you say that there were really not very many people at one time, but I looked at the pictures. There were sure a lot of people. More than the 30 to 50 that you suggest. Even in those photos. Well, with respect to the other incidences, the 4th of July fireworks launched from the street. Loud, noisy. The police were called. Association sponsored block parties that saw people congregating in the streets. Was the 4th of July event considered proper? Was it allowed? Officially allowed? I think I think the question, the question is, what was what? What was the homeowners association response to a loud, noisy event that unlike the calling the police? The police actually the homeowners association didn't take action, Your Honor. But the police actually were called and the homeowners association did nothing. No notice of violation. No telephone call. No letter. No nothing. And I think it's telling, Your Honor, that the district court in in neither his 50 B or new trial discussion mentioned any of these episodes of selective enforcement, which alone I think are sufficient to warrant restoring the jury's verdict. All right, your time is way up. And I thank you for your arguments. Both of you in a really interesting and challenging case. Thank you. Thank you, Your Honors. Morris v. West Chain Estates is submitted. And we'll go to the last case of the day and of the week. Bossman v. The Sage International School.
judges: Tashima, Berzon, Collins